**DIAPULSE CORPORATION OF AMERICA, Plaintiff,**

v.

**ROCHESTER LEASING CORPORATION and Rochester Capital Leasing Corporation, Defendants,**

**Dynapower Systems Corporation, Intervener.**

**Civ. No. 11498.**

United States District Court
W. D. New York.

Oct. 28, 1967.

Charles Shepard, Rochester, N. Y., for plaintiff; William F. Kelly, Jr., West Caldwell, N. J., of counsel.

James M. Wetzel and Robert L. Harmon, Chicago, Ill., and George Shaw, Rochester, N. Y., for defendants and intervenor; James P. Hume, Chicago, Ill., of counsel.

HAROLD P. BURKE, District Judge.

Trial before the undersigned at Rochester, N. Y., March 6 through March 9, 1967.

## FINDINGS OF FACT

1. Plaintiff, Diapulse Corporation of America, is a Delaware corporation, having its principal place of business at Lake Success, New Hyde Park, N. Y.

2. Defendants, Rochester Leasing Corporation and Rochester Capital Leasing Corporation, are New York corporations, having their principal offices and places of business at Rochester, N. Y.

3. Intervener, Dynapower Systems Corporation, is a California corporation, having its principal place of business and office at Santa Monica, California.

4. Plaintiff is the owner by assignments recorded in the Patent Office of the two patents in suit, No. 3,043,310 granted July 10, 1962, and No. 3,181,535 granted May 4, 1965. Milinowski is named as the inventor in both patents.

5. At the opening of the trial, Dynapower made a motion to dismiss the action upon the ground that the plaintiff was not the owner of the patents in suit and had no standing to sue. It requested attorneys' fees, costs, and punitive damages in the amount of $25,000 as a consequence of Diapulse's refusal to comply with discovery proceedings relating to the title issue. Evidence on the issue of title was taken at the very beginning of the case. In its main brief filed after the trial (p. 83) it says "Dynapower continues to hold the view that its position is well founded, and that Diapulse does not have title to the patents in suit. However, due to the overriding interest, both to the public and to Dynapower, in having the patents declared invalid and not infringed, Dynapower chooses not to press the title issue, and so much of the motion as requests dismissal on that ground may accordingly be disregarded."

6. Dynapower bases its claim of lack of title upon an assignment allegedly notarized February 7, 1963, intended as security for a debt, which was to be delivered to an escrow agent to be surrendered to the Estate of Abraham J. Ginsberg in the event of default by Diapulse on the debt. I am not convinced by the proof that the assignment was ever executed, but even if it were, the assignment was never delivered and was ineffective to transfer title to the Estate of Abraham J. Ginsberg. An assignment had been prepared by Diapulse and by its terms was intended only as a conditional assignment, under which the Ginsberg Estate has never claimed any title, because there has been no default in the obligations of Diapulse to the Ginsberg Estate. Diapulse is the owner of the patents and is the real party in interest.

7. The '310 patent issued July 10, 1962. It related to an athermapeutic apparatus for administering therapeutic treatments to patients and more particularly was concerned with the treatment head to which a patient is disposed during administration of the treatment. The '535 patent issued May 4, 1965. It also related to an athermapeutic apparatus.

8. Dynapower manufactures and sells pulsed high frequency electrotherapeutic machines under the trade name "Theramatic". The Rochester defendants were in the business of financing the purchase or leasing of medical equipment. They leased Dynapower's "Theramatic" equipment.

9. Diapulse sued the Rochester defendants, claiming infringement of its patents by using, selling and leasing Dynapower's "Theramatic" machines and inducing others to use them. Dynapower was permitted to intervene to assert invalidity of the patents and unfair competition on the part of Diapulse.

10. The '310 application was filed April 24, 1959. Diapulse relies solely on this filing date as the earliest date on which the inventor Milinowski conceived the claimed subject matter. The proof regarding the Offering Circular bearing the notation "The date of this Offering Circular is April 23, 1958" falls short of establishing that the Offering Circular was printed and published more than one year prior to the '310 application filing date. Moreover, the document did not describe the invention claimed in the

'310 patent in sufficiently precise and detailed terms to enable one skilled in the art to construct the subject matter of the '310 patent.

11. Prior to the early 1940's, Milinowski had applied for patents on pulsed radio frequency electrotherapeutic apparatus. He was employed by Dr. Ginsberg's Q. O. S. corporation. The applications were assigned to Dr. Ginsberg. The applications resulted in the issuance on March 17, 1942, of three patents, all of which expired on March 16, 1959. One of these, patent No. 2,276,995, covers a circuit for generating pulsed radio frequency oscillations. The machine it describes corresponds functionally to that of the '535 patent in suit. One of these three patents, No. 2,276,996, shows a treatment head for use with the circuit of the '995 patent. Both the '995 and '996 patents were cited in the file histories of the patents in suit. Sixteen machines conforming to the '995 and '996 patents were built by or for Q. O. S. corporation and sold in or about 1942. At that time, such machines were not required by the Federal Communications Commission to maintain a fixed radio frequency. After World War II, the FCC designated among others, the frequency ban centered at 27.12 megacycles for the operation of medical equipment. Accordingly, in 1953, Dr. Ginsberg negotiated with Lysco Manufacturing Company, Hoboken, New Jersey, and asked George Scott, one of Lysco's founders, to redesign the old Q. O. S. machine to conform with FCC requirements and to obtain FCC type approval. Scott took one of these machines from Dr. Ginsberg's office. Relying solely on his own skill and that of other Lysco personnel, he designed and constructed a machine shown in Lysco drawing M–172. Scott then obtained FCC type approval of the Lysco machine on July 8, 1953. Thereafter, Scott took the Lysco machine to Dr. Ginsberg's office, plugged it in, and demonstrated its use. Milinowski did not participate in any way in the development of the Lysco machine. At the time in 1953 when Scott installed the Lysco machine in Dr. Ginsberg's office, and until late 1956, Milinowski was employed by Dr. Ginsberg, with ample opportunity to examine the Lysco machine.

12. Scott's Lysco treatment head included a spiral inductance in parallel with a variable tuning capacitor which was adjustable from the exterior of the head. For all practical purposes it was the same as the head of the '310 patent. The Lysco head included all the elements recited in Claims 1, 3, 5, and 7, and all the elements of Claims 2, 4, 6, 8 and 9, except the indicating means, and the perpendicular relationship of the capacitor plates to the inductor coil. Thus the identical subject matter of Claims 1, 3, 5 and 7 was invented by Scott and placed in public use long before the filing of the '310 application. There is no evidence tending to show that Dr. Ginsberg's public use of the Lysco machine was experimental.

13. The Lysco machine completely anticipated the subject matter of Claims 1, 3, 5 and 7 of the '310 patent and contained all of the elements of Claims 2, 4, 6, 8 and 9, except the indicating means or glow lamp, and the perpendicular relationship of the capacitor plates to the induction coil. The use of a lamp and a pick-up loop as a means for indicating resonance was well known and obvious for many years prior to the Lysco machine. The perpendicular alignment of the capacitor plates was shown in the Milinowski patent No. '996.

14. Means for tuning the patient load circuit, including an exteriorly operative variable capacitor, were well understood in the art prior to April 24, 1959, as demonstrated by the 1948 Maxson patent No. 2,448,540, and a 1949 article "Electrotherapy and Light Therapy" in a paragraph headed "The Patient's Circuit". In view of these references, it would have been obvious to modify the treatment head of Milinowski's '996 patent to make the capacitive element variable and to provide a knob on the exterior of the housing.

15. The use of a lamp and inductive coil for indicating proper patient load

circuit tuning has long been recognized in the art, as shown in the 1946 article in the publication "Electronics" by R. L. Norton, under the heading "Crystal-Controlled Diathermy", also in an article published in December, 1947 in "Electronic Engineering" under the heading "Stable Frequency Short Wave Diathermy", also in a 1944 publication "Medical Physics", under the heading "Physical Therapy", also in 1940 Maxson patent No. 2,213,820. In view of the teaching of these references, it would have been obvious to modify the treatment head of Milinowski's 1942 patent '996, or Scott's 1953 Lysco head, to provide means for indicating when the patient load circuit is properly tuned.

16. When Dynapower first learned of the claim of Diapulse to the trade that Dynapower's machines infringed its patents, Dynapower inquired directly of Diapulse, seeking verification or explanation of the charges. In response, Diapulse consistently denied that any assertion of infringement had been made. It refused to indicate whether it considered Dynapower's machines to be infringing and gave its assurance that "where patents are concerned * * * those believed to be effected would be directly advised of the situation." In view of the conduct of Diapulse in this respect, Dynapower felt assured that its machines were not considered to be an infringement of the '310 patent.

17. A Dynapower machine with a treatment head was obtained by Diapulse and subjected to testing in February, 1963, about seven months after the issuance of the '310 patent. Almost a year later, on January 9, 1964, in a deposition given in connection with litigation pending in another United States District Court, Kelly, Diapulse's Secretary and patent attorney, stated that Diapulse did not then contend that any machine manufactured by Dynapower constituted an infringement of Diapulse's patents, and that to the best of his knowledge, no such contention had ever been made. Dynapower considered this statement to be a clear confirmation by Diapulse that it did not feel that the '310 patent was being infringed.

18. On the basis of the conduct of Diapulse in these respects, Dynapower was led to believe that its machines were not considered by Diapulse to infringe the '310 patent, and was led to act in reliance upon that belief in continuing to manufacture and sell its machines. Dynapower's belief and reliance in this respect was clearly justified.

19. One of the accused machines produced by Diapulse at the trial was identified by Dynapower as one of a group of eleven machines which were acquired by Dynapower from Theramatic Electric Corporation in 1961. All of these machines were sold prior to July 10, 1962, the issue date of the '310 patent. Dynapower cannot be held to have infringed the '310 patent by reason of any of its activities with respect to those machines. Dynapower considered the adjusting knob on the treatment head to be useless, and caused a technician to go out in the field and remove the knob on ten of the eleven machines. The only other machine having a knob is the one produced by Diapulse at the trial; this machine has remained in the possession of Diapulse since 1961. Accordingly, even actual continuing use of the other ten machines by their owners could not be held to constitute infringement of the '310 patent.

20. Dynapower has made and sold, subsequent to the issue date of the '310 patent, apparatus substantially identical to the other accused device, including a treatment head produced at the trial. The accused head includes all of the essential elements of the '310 patent claims, except the regulating means operable from the exterior of the head to tune the patient load circuit. Although the capacitor in the accused head is variable, it does not have a knob and shaft arrangement for varying it from the exterior of the head. The only way of adjusting the capacitor is by inserting a screwdriver or tuning wand through a hole in the head. This can be done only with the head in a few non-treatment

positions, and with the plastic face-plate off. The face-plate, which is held in position on the head by four screws, must be removed in order to allow visibility for guiding the screwdriver or other means to the capacitor slot. The accused head includes no means of any kind to guide a screwdriver. At the trial, Diapulse's expert was unwilling to attempt the adjustment because of the risk of radio frequency burns and short circuiting, and he said, "it is unlikely that an M. D. would do it." The accused head does not infringe the '310 patent.

21. The '535 patent has an effective filing date of application of October 4, 1957. Diapulse relies solely upon this filing date to support the fact of invention and upon the application filing date as the earliest date upon which the inventor, Milinowski, conceived the claimed subject matter. Diapulse has no other record of the invention and offered no corroboration. When Diapulse's patent attorney Kelly was asked by Ross to prepare the '535 patent application, Kelly had his draftsman prepare drawings directly from the apparatus Kelly did not recall having personally viewed the apparatus. There were no drawings or written disclosure from Milinowski. Neither Kelly nor Milinowski have any records relating to conception, reduction to practice, testing, manufacturing or use of the claimed subject matter. Diapulse has produced no evidence which tends to show that Milinowski independently conceived the subject matter claimed in the '535 patent.

22. The circuitry of the Lysco machine is substantially identical to that shown in the '535 patent, except that the Lysco machine did not include a "first control means" comprising a plurality of impedance elements and a switch for controlling pulse width. The means for accomplishing pulse width control through the use of a plurality of impedance elements and a switch were well known and obvious at the time the Lysco machine was built.

23. Pulsed high frequency athermapeutic apparatus was not new. It was the subject of the '995 and '996 Milinowski patents issued on March 17, 1942. The 1954 French patent No. 1,055,776 discloses an electrical circuit for generating pulsed radio frequency electrotherapeutic signals, as does the expired 1942 Milinowski patent '995. The 1946 "Electronics" article under the heading "Crystal-Controlled Diathermy" and the 1947 "Electronic Engineering" article under the heading "Stable Frequency Short Wave Diathermy" both disclose a radio frequency electrotherapeutic generating system including a crystal-controlled oscillator with means for multiplying the crystal frequency and applying the multiplied frequency to a power amplifier for increasing the energy of the oscillations to the power desired for application to the patient, substantially identical to the oscillation generating path and the power amplifier of the '535 patent. Moreover, the French patent above referred to indicates means for controlling both the pulsed width and frequency, and points out that such control can be achieved either electronically or by mechanical switch. The 1944 article of A. E. Ritchie (D–11, Tab 12) shows a pulse generator for biological work in which both the pulse width and frequency are controlled by means comprising a plurality of impedance elements and a switch.

24. Thus, long prior to October 4, 1957, the concept of producing pulsed radio frequency therapeutic oscillations, and the means for producing them, were well recognized. In view of the teachings of the prior art above referred to, it would have been obvious to one skilled in the art to modify the crystal-controlled oscillating systems of the "Electronics" and "Electronic Engineering" articles referred to above, in accordance with the teaching of the French patent and the Ritchie article, to provide a pulsed output with the pulse width and frequency controlled by a plurality of impedance elements and a switch; or it would have been obvious to modify the

pulsed apparatus of the French patent or the Milinowski '995 patent, in accordance with the "Electronics" or "Electronic Engineering" articles to provide crystal-control for the oscillator frequency.

25. Dynapower cannot be held to have infringed the '535 patent by reason of its activities with respect to the machines manufactured by Theramatic Electric Corporation.

26. The circuitry of the accused Theramatic machines manufactured by Dynapower does not include "first control means" comprising "a plurality of impedance elements and a switch" for adjusting pulse width, as required by all of the '535 patent claims. As a result of the amendment of the claims, in response to the examiner's rejection on the prior art, to recite "first control means" as comprising "a plurality of impedance elements and a switch", the amended claims were unequivocally directed to specific structure. But for the amendment of the claims to recite "first control means" as comprising "a plurality of impedance elements and a switch", the claims would not have been allowed. The drawings, specification, claims and file history are all consistent in identifying the "first control means" of the '535 patent as including a plurality of impedance elements and a switch. Diapulse is estopped from attempting to make those words cover equivalent structures. The accused Theramatic machine does not include all of the elements specified in each of the '535 patent claims. The accused machine does not infringe the '535 patent claims.

27. The Rochester defendants did not make, use, or sell Dynapower's accused Theramatic machines. They are not infringers.

28. The proof is insufficient to establish that Diapulse was guilty of unfair competition. Diapulse did not misuse the patents by bringing four infringement suits against intervener's dealers, nor by making or causing to be made, threats of infringement suits against various of intervener's users and dealers, nor by using the patents and the infringement action as part of a plan to destroy intervener's dealer organization and thus eliminate intervener as a competitor.

## CONCLUSIONS OF LAW

1. Claims 1, 3, 5 and 7 of the '310 patent are invalid because the claimed subject matter was invented in the United States long prior to April 24, 1959 by George R. Scott assisted by other employees of Lysco Corporation, because Milinowski was not the inventor of the claimed subject matter, and because the claimed subject matter was known and used by others and was in public use in the United States prior to April 24, 1959.

2. The '310 patent is invalid because the claimed subject matter would have been obvious to a person ordinarily skilled in the art.

3. Diapulse is estopped to assert infringement of the '310 patent with respect to any equipment manufactured by Dynapower, because of its prior conduct.

4. The claims of the '310 patent are not infringed by any machines manufactured, sold or used by Dynapower subsequent to July 10, 1962.

5. The '535 patent is invalid because the claimed subject matter would have been obvious to one ordinarily skilled in the art.

6. Diapulse is estopped to assert for "first control means" of the claims any construction broader than the specifically recited "plurality of impedance elements and a switch".

7. The claims of the '535 patent are not infringed by any machines manufactured, used or sold by Dynapower subsequent to May 4, 1965.

8. Rochester Leasing Corporation and Rochester Capital Leasing Corporation have not infringed the claims of the '310 or '535 patents because they

neither made, used or sold the accused Theramatic machines, nor did they actively induce others to make, use or sell such machines.

9. Dynapower is not entitled to recover for unfair competition.

10. Dynapower's demand for attorneys' fees under Section 285 of Title 35, U.S.C., is denied.

11. Dynapower's motion to add Jesse Ross to this action as a third-party defendant is denied.

12. Dynapower is entitled to an order permanently restraining Diapulse, its officers, directors, agents, servants, employees and attorneys, and all persons in active concert or participation with them from asserting the patents in suit in any way against Dynapower or its dealers, users, or customers, present or potential, or otherwise in any way interfering with or disparaging Dynapower's business.

13. Dynapower's request for an order directing Diapulse to dismiss with prejudice the patent infringement actions relating to the said patents herein suit, presently pending in the United States District Court for the Northern District of Illinois, for the Southern District of Illinois, and for the Southern District of Indiana, and directing Diapulse to pay reasonable attorneys' fees and costs in each of said actions, is denied.

14. Dynapower's motion made at the opening of the trial, to dismiss the action upon the ground that the plaintiff is not the owner of the patents in suit and had no standing to sue, was in effect mainly withdrawn by Dynapower by the statement in its main brief filed after the trial (p. 83), but since it did not unequivocally withdraw the motion in toto, the motion is in all respects denied.

15. The suit of Diapulse is dismissed on the merits, with ordinary costs to the defendants.

16. Dynapower is entitled to ordinary costs.

Settle judgment on 5 days' notice.